# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

     *Plaintiff,*

    v.

U.S. DEPARTMENT OF STATE,

     *Defendant.*

Civil Action No. 15-689 (RDM)

## MEMORANDUM OPINION AND ORDER

In March 2015, Plaintiff Judicial Watch submitted three Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests for records to the U.S. Department of State. Those requests sought release of records relating to former Secretary of State Hillary Clinton's use of "a non-'state.gov' email address" and "clintonemail.com email server." *See* Dkt. 22-3 at 3, 21, 31. The State Department did not provide a timely response to any of the three requests, prompting Judicial Watch to file this action on May 6, 2015. *See* Dkt. 1. Subsequently, the State Department conducted an extensive search, identified six responsive documents, released five of those documents to Judicial Watch with partial redactions, and withheld one in full. *See* Dkt. 22-1 at 5–6; Dkt. 26 at 4–5.

The parties have now cross-moved for summary judgment. Dkt. 22; Dkt. 26. Those motions raise three questions: First, did the State Department properly withhold the Report of Investigation ("ROI") for former State Department employee Bryan Pagliano? Second, is there any reasonably segregable, non-exempt information in the ROI that the State Department should have released to Judicial Watch? Third, did the State Department properly redact portions of an email chain between Secretary Clinton and General David Petraeus? For the reasons explained

below, the Court concludes that the answer to the first two questions is "yes," and that the answer to the third question is, in part, "yes," and, in part, "perhaps."

Accordingly, the Court will grant in part and deny in part the State Department's motion for summary judgment and will deny Judicial Watch's cross-motion.

## I. BACKGROUND

Between March 6, 2015, and March 9, 2015, Judicial Watch submitted three FOIA requests to the State Department. Dkt. 22-4 at 1 (Def.'s SUMF ¶ 1). The first, dated March 6, sought records relating to Secretary Clinton's "use of a non-'state.gov' email address," including records "concerning security, classification, preservation, and compliance with the Federal Records Act and/or [FOIA]." Dkt. 22-3 at 3. Judicial Watch's second request, dated March 9, sought "communications between officials" at the State Department and White House concerning Secretary Clinton's "use of non-'state.gov' email addresses." *Id.* at 21. And the third request, also dated March 9, sought records "related to expenses incurred in the creation, maintenance[,] and/or use of the clintonemail.com email server domain." *Id.* at 31.

On October 30, 2015, the State Department "completed its search for records potentially responsive to [Judicial Watch's] requests," locating "approximately 16,900 pages" of potentially responsive documents. Dkt. 11 at 2. The parties agreed that the State Department would complete its review and production of the records by January 20, 2016, *id.* at 3, and, by that date, the Department produced three documents to Judicial Watch, Dkt. 22-4 at 2 (Def.'s SUMF ¶ 7). It also informed Judicial Watch that it was withholding a fourth document in full—an ROI created as part of the background investigation into Bryan Pagliano, which was prepared in the course of considering his appointment to a "Schedule C" position at the Department. Dkt. 26-1 at 12–13; *see also* Dkt. 22-4 at 2 (Def.'s SUMF ¶ 8). Prior to his appointment, Pagliano "ran

technology for the Clinton for President campaign," Dkt. 26-1 at 13, and, while at the State Department, he served as an "IT specialist" to Secretary Clinton, Dkt. 26 at 21 (Pl.'s SUMF ¶ 13).

In mid-2016, the parties each moved for summary judgment. *See* Dkt. 17; Dkt. 18. Among other issues, that original round of briefing raised the question whether the State Department had conducted an adequate search for responsive records. *See* Dkt. 18 at 5–6. On July 12, 2016, however, the FBI informed the State Department that it had "obtained certain information that may include [State Department] agency records" and indicated that it would "provid[e] this information to [the Department] for review" and "subsequent FOIA processing as appropriate." Dkt. 22-3 at 44. "The FBI transferred such information to [the] State [Department]" in July and August 2016, and the Department "agreed to conduct searches of the information being transferred" for "records responsive to [two of] [Judicial Watch's] FOIA requests." Dkt. 22-2 at 24–25 (Second Stein Decl. ¶ 64). After reviewing the newly acquired documents, the State Department released two additional documents to Judicial Watch, including an email exchange between Secretary Clinton and General David Petraeus. Dkt. 22-4 at 2 (Def.'s SUMF ¶ 11). That email exchange involved a staffing issue and a recommendation regarding dealing with a foreign leader. Dkt. 22-1 at 18. Because Judicial Watch "indicated that it wishe[d]" to add "challenge[s] [to] the redactions applied" to the email exchange and to "the adequacy of [State's] supplemental search" to its initial set of challenges, the parties "propose[d] that the Court deny the pending cross-motions for summary judgment as moot" and set a new schedule for summary judgment briefing that would "encompass all of the matters . . . currently at issue" in the litigation. Dkt. 21 at 1. The Court accepted the parties' proposal, *see* Minute

Order (Oct. 28, 2016), and the parties subsequently filed the cross-motions for summary judgment that are currently before the Court, *see* Dkt. 22; Dkt. 26.

## II. LEGAL STANDARD

The Freedom of Information Act is premised on the notion that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). It thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions. "These exemptions are explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation and internal quotation marks omitted). FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g.*, *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In a FOIA action, "the Court may award summary judgment to an agency solely on the basis of information provided in affidavits or declarations that describe '. . . the justifications for nondisclosure [of records] with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Thomas v. FCC*, 534 F. Supp. 2d 144, 145 (D.D.C. 2008) (alterations in original) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

## III. ANALYSIS

**A.    Pagliano ROI**

The State Department asserts that it properly withheld Pagliano's ROI in full under FOIA

Exemptions 7(C) and 7(E). Dkt. 22-1 at 12–17. Those exemptions apply to records "compiled

for law enforcement purposes," the disclosure of which "could reasonably be expected to

constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), or "would

disclose techniques and procedures for law enforcement investigations," *id*. § 552(b)(7)(E).

The Department further argues that, after "review[ing] [the ROI] on a line-by-line basis,"

it has determined that "there is no additional non-exempt information that may reasonably be

segregated and released." Dkt. 22-1 at 20. Judicial Watch, in turn, responds that the State

Department has failed to satisfy Exemption 7's threshold requirement that the ROI was

"compiled for law enforcement purposes," Dkt. 26 at 8–10; that the Exemption 7(C) balancing

test favors disclosure, *id*. at 11–13; that the Department has failed to demonstrate that

information contained in the ROI would reveal law enforcement techniques within the meaning

of Exemption 7(E), *id*. at 13; and that the Court should perform an *in camera* review of the ROI

to determine if there are any segregable portions that can be released, *id*. at 16–17.[1]

1.    *Exemption 7(C)*

Exemption 7(C) protects from disclosure "records or information compiled for law

enforcement purposes," but "only to the extent that" disclosure "could reasonably be expected to

constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Accordingly,

---

[1]  The State Department also invokes FOIA Exemption 6 to justify withholding the ROI in full, but because the Court sustains the Department's action under Exemption 7, it need not consider whether this additional exemption is also available.  *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (noting that Exemption 7(C)'s "broader" protections necessarily apply to "all information that would fall within the scope of Exemption 6"); *see also Bartko v. U.S. Dep't of Justice*, 79 F. Supp. 3d 167, 171–72 (D.D.C. 2015).

to invoke Exemption 7(C), the State Department must satisfy a two-part test: First, it must "make a threshold showing that . . . [Pagliano's ROI] w[as] compiled for a law enforcement purpose." *Lindsey v. FBI*, --- F. Supp. 3d ---, No. 16-2302, 2017 WL 4179886, at *3 (D.D.C. Sept. 20, 2017) (internal quotation marks omitted). Second, it must demonstrate that disclosure of the ROI "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Tracy v. U.S. Dep't of Justice*, 191 F. Supp. 3d 83, 95 (D.D.C. 2016) (quoting 5 U.S.C. § 552(b)(7)(C)).

          a.      <u>Compiled for Law Enforcement Purposes</u>

To establish that Pagliano's ROI was "compiled for law enforcement purposes," the State Department "need only 'establish a rational nexus between the investigation and one of [the Department's] law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law.'" *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)). "The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal." *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n* (*PEER*), 740 F.3d 195, 203 (D.C. Cir. 2014).

The Department argues that Pagliano's ROI meets that standard because "it was created by State's Bureau of Diplomatic Security ('DS') as part of a security clearance background investigation." Dkt. 22-1 at 14 (citing Dkt. 22-2 at 29, 32 (Second Stein Decl. ¶¶ 77, 84–85)). It asserts that DS is the "law enforcement arm of State," and that the ROI is "an investigative document utilized by law enforcement . . . entities . . . for security clearance related purposes." *Id.* (quoting Dkt. 22-2 at 29 (Second Stein Decl. ¶¶ 76–77)). Judicial Watch, for its part, responds that the ROI is merely "a report memorializing a required, routine background

check/investigation" that is done "for all high level employees" and that is "performed as an administrative duty." Dkt. 26 at 10.

The State Department has the better of the argument. It is well established that "[b]ackground investigations conducted to assess an applicant's qualifications, such as [an agency's] clearance and investigatory processes, inherently relate to law enforcement." *Morley v. CIA*, 508 F.3d 1108, 1128–29 (D.C. Cir. 2007) (internal quotation marks omitted). The D.C. Circuit's decision in *Mittleman v. Office of Personnel Management*, 76 F.3d 1240 (D.C. Cir. 1996), is instructive. In that case, the plaintiff "requested copies of [the] investigative file" that the Office of Personnel Management ("OPM") had compiled during "a background investigation . . . in connection with her eligibility for a 'critical sensitive' security clearance," and OPM withheld them pursuant to Exemption 7(D). *Mittleman*, 76 F.3d at 1241–42. The plaintiff claimed that Exemption 7(D) did not apply to her background check records because they were not "compiled for law enforcement purposes." *Id.* at 1242. But the Court of Appeals rejected the argument, observing that "[t]he principal purpose of a background investigation is to ensure that a prospective employee has not broken the law or engaged in other conduct making her ineligible for the position." *Id.* at 1243. Because the background check helps "to determine whether there are any law enforcement or security issues" in an applicant's "past that could affect her ability to carry out the position," the D.C. Circuit concluded that "OPM's background investigation information was compiled for 'law enforcement purposes.'" *Id.* (internal quotation marks and alterations omitted).

The same conclusion holds here. In support of its position, the State Department offers the declaration of Eric Stein, the "Acting Co-Director of the Office of Information Programs and Services." Dkt. 22-2 at 1 (Second Stein Decl. ¶ 1). Stein attests that Pagliano's ROI was

"created" by DS, the "law enforcement arm of State" that is responsible for "protect[ing] people, information, and property" and "conduct[ing] personnel security investigations." Dkt. 22-2 at 29 (Second Stein Decl. ¶ 76). An ROI, Stein further attests, is "an investigative document utilized by law enforcement and personnel adjudication entities within DS for the purpose of investigating the private background of an individual for security clearance related purposes and/or adjudication of suitability for a sensitive position within the U.S. Government." *Id.* at 29 (Second Stein Decl. ¶ 77). It is prepared as part of a "Single Scope Background Investigation" ("SSBI"), which is a "type of security clearance investigation" used "to determine whether the subject [of the SSBI] possesses sufficient reliability, trustworthiness, and ability to protect classified information and to hold a sensitive government position." Dkt. 22-2 at 32 (Second Stein Decl. ¶¶ 84–85). In other words, the State Department produces ROIs as part of a process to determine if a potential employee has any law enforcement- or security-related issues in his background that might indicate that he should not be entrusted with classified information or that he might pose a security risk to the Department.

Stein's declaration—which is entitled to a presumption of good faith, *see Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017)—places this case on all fours with the D.C. Circuit's decisions in *Mittleman* and *Morley*, and Judicial Watch makes no effort to distinguish those cases. In addition, multiple decisions of this Court have concluded that records related to background investigations fall within Exemption 7's ambit,[2] and a decision in the Northern

---

[2] *See, e.g.*, *Henderson v. Office of the Dir. of Nat'l Intelligence*, 151 F. Supp. 3d 170, 175–77 (D.D.C. 2016) (citing *Morley* and *Mittleman* to conclude that documents "set[ting] forth the [background check investigation] process used by the defendants in their efforts to prevent bad actors from obtaining access to sensitive government information" satisfied Exemption 7's "law enforcement purpose" requirement); *Archibald v. U.S. Dep't of Justice*, 950 F. Supp. 2d 80, 87 (D.D.C. 2013) (determining that Exemption 7 applied to the "background check on a presidential candidate" and citing *Mittleman* for the proposition that "background checks by nature implicate

District of Illinois has applied *Mittleman*'s analysis to the specific situation now before the Court, concluding that "documents related to [DS's] background check" of an applicant satisfied Exemption 7's "compiled for law enforcement purposes" requirement, *Erwin v. U.S. Dep't of State*, No. 11-C-6513, 2013 WL 6452758, at *6 (N.D. Ill. Dec. 9, 2013).

The Court, accordingly, concludes that the State Department has demonstrated that Pagliano's ROI was compiled for law enforcement purposes within the meaning of Exemption 7.

      b.    <u>Balancing</u>

Next, the Court must determine whether release of Pagliano's ROI "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "In deciding whether the release of [Pagliano's ROI] constitutes an 'unwarranted' invasion of privacy under Exemption 7(C)," *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011), the Court "must balance the public interest in [its] disclosure against the [privacy] interest Congress intended the Exemption to protect," *id.* (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989)) (second alteration in original). Here, as the State Department concluded, *see* Dkt. 22-2 at 30, 33–34 (Second Stein Decl. ¶¶ 80, 87, 89), that balance tips decisively in favor of the Department's decision to withhold the ROI.

First, the privacy interest at stake is a weighty one. Pagliano's ROI was produced after a "security clearance investigation" that "require[d] an intensely personal set of inquiries into [his] life," including an examination of his "psychological conditions, alcohol consumption, [and]

---

law enforcement interests"); *Doe v. U.S. Dep't of Justice*, 790 F. Supp. 17, 19–20 (D.D.C. 1992) (concluding that an "[i]nvestigative background check[] performed by the FBI" met Exemption 7's threshold requirement because its "principal purpose" was "to assure that a prospective Justice Department employee had not himself broken the law, and to determine whether there [we]re any law enforcement or security issues in his past that could affect his ability . . . to carry out the Department's mission").

sexual behavior." *Id*. at 32–33 (Second Stein Decl. ¶¶ 85–86). As a result, his ROI contained "personal information" pertaining to his "relationships, character assessments, financial details, and medical information," as well as information pertaining to third parties interviewed by the State Department during the investigation. Dkt. 22-2 at 33 (Second Stein Decl. ¶ 87). The Supreme Court has "held 'as a categorical matter' that 'a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy," *ACLU*, 655 F.3d at 8 (quoting *Reporters Comm.*, 489 U.S. at 780), and it is difficult to contemplate an agency record with a more pronounced privacy interest than an ROI produced as part of a comprehensive background check that analyzes the subject's "psychological conditions, alcohol consumption, [and] sexual behavior." *Cf. Quiñon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996) ("[W]hile it is true that [g]overnment officials may have a somewhat diminished privacy interest . . . they do not surrender all rights to personal privacy when they accept a public appointment." (internal quotation marks and alteration omitted)).

On the other side of the scale, the Court must weigh "the extent to which disclosure" of the ROI would further "'the basic purpose of'" FOIA, which is "'to open agency action to the light of public scrutiny'" and advance "'citizens' right to be informed about what their government is up to.'" *ACLU*, 655 F.3d at 6 (quoting *Reporters Comm.*, 489 U.S. at 772–73). Records that "reveal[] little or nothing about an agency's own conduct" do not further the public interest embraced by Exemption 7(C); rather, it is "information that sheds light on an agency's performance of its statutory duties [that] falls squarely within th[e] statutory purpose" of the exemption. *Reporters Comm.*, 489 U.S. at 773 (internal quotation marks omitted). Judicial Watch, however, has offered little basis for the Court to conclude that "the public interest sought to be advanced is a significant one, [that it is] an interest more specific than having the

information for its own sake" and that the requested disclosure "is likely to advance that interest." *Nat'l Archives and Records Admin. v. Favish,* 541 U.S. 157, 172 (2004). Instead, it merely asserts that the "public interest in knowing more about the . . . employee [who] . . . maintained and serviced the private email server system is enormous," Dkt. 26 at 12, and it claims that the "[r]elease of Pagliano's ROI will reveal much about [the] State Department's conduct in performing its investigative obligation in providing Pagliano's security clearance," Dkt. 29 at 2, and "may shed further light on the truth of the Clinton email arrangement," Dkt. 26 at 11.

After balancing these competing interests, the Court concludes that the scale tips in favor of the State Department's decision to withhold Pagliano's ROI. First, Judicial Watch offers no reason to believe—other than its bare speculation—that the ROI might shed light on Secretary Clinton's use of the "clintonemail.com server" or "non-'state.gov'" email address. *See Favish*, 541 U.S. at 174 (explaining that "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted . . . improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure"). Second, whatever public interest there might be in learning intimate *personal* details about a State Department employee tasked with a high-profile position, that interest is not the type contemplated by Exemption 7(C). The information collected during Pagliano's background check and summarized in the ROI—details about his personal relationships, mental and physical health, and financial history—provides minimal, if any, insight about how State conducts its business. Third, the fact that the State Department placed great "trust and confidence" in Pagliano does nothing to distinguish him from thousands of other government employees and members of the military who perform sensitive duties of enormous

national importance and who—like Pagliano—have substantial privacy interests in the information contained in their background checks and ROIs.

The Court, therefore, concludes that State properly withheld Pagliano's ROI on the basis of Exemption 7(C).

2.    *Exemption 7(E)*

The State Department also invokes FOIA Exemption 7(E) to protect Pagliano's ROI. Like Exemption 7(C), this exemption requires a two-step inquiry. The first step, moreover, is the same under both provisions—that is, the Court must determine whether the records were compiled for law enforcement purposes. Because the Court has just resolved that question for purposes of Exemption 7(C), it need not repeat that analysis here.

The second step requires additional discussion, but is equally straightforward. The Court must determine whether release of those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). As the D.C. Circuit has observed, there is some disagreement about whether the final clause, which asks whether the disclosure would pose a "risk of circumvention of the law," applies only to the disclosure of "guidelines" or whether it also applies to the disclosure of "techniques and procedures." *PEER*, 740 F.3d at 204 n.4. But, as the Court of Appeals has also observed, "given the low bar posed by the 'risk of circumvention of law' requirement, it is not clear that the difference matters much in practice." *Id.*

Treating the "risk of circumvention of law" requirement as applicable to the disclosure of "techniques and procedures," as the D.C. Circuit has done in the past, *see Blackwell*, 646 F.3d at

41–42, the Court nonetheless concludes that the Pagliano ROI is protected by Exemption 7(E). "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* at 42 (internal quotation marks omitted). Reduced to its minimum, the exemption requires only a "chance of a reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

"It is self-evident that information revealing security clearance procedures could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates." *Morley*, 508 F.3d at 1129. Yet, that is precisely the type of information that Stein has attested would be disclosed if the Pagliano ROI were released. He asserts, for example, that "[t]he ROI contains information demonstrating specific techniques and procedures used by DS personnel while conducting background investigations, including methods for verifying information and cooperating with other law enforcement bodies." Dkt. 22-2 at 34 (Second Stein Decl. ¶ 90). That assertion comports with common sense. Knowing what information DS personnel consider, where they look, and how they evaluate that information necessarily reveals their techniques and procedures, and disclosing that information poses "a chance of a reasonably expected risk" of circumvention.

The Court, accordingly, concludes that the State Department's reliance on Exemption 7(E) was also justified.

3.    *Segregability*

The Court must also consider whether the State Department has met its burden of demonstrating that there was no reasonably segregable, non-exempt information contained in the

ROI that it could release in response to Judicial Watch's FOIA request. FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "While the segregability requirement applies to all documents and all exemptions in the FOIA," the courts have recognized that "segregation is not required where the 'exempt and nonexempt information are inextricably intertwined, such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value.'" *Covington v. McLeod,* 646 F. Supp. 2d 66, 72 (D.D.C. 2009) (quoting *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000)) (first citation omitted). The government bears "the burden of justifying nondisclosure," *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 260 (D.C. Cir. 1977), and must "show with reasonable specificity why the documents cannot be further segregated," *Armstrong v. Exec. Office of the President,* 97 F.3d 575, 578 (D.C. Cir. 1996) (internal quotation marks omitted). To carry this burden, the government must provide a "'detailed justification' for [withheld records'] non-segregability." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead,* 566 F.2d at 261).

The State Department has met its burden here. The Stein declaration explains that the Department "conducted a line-by-line review of the ROI and determined that no reasonably segregable, non-exempt material could be released." Dkt. 22-2 at 35 (Second Stein Decl. ¶ 91). Stein also explains that, "[b]ecause the nature of an ROI for an SSBI is to inquire into the most intimate aspects of an individual's life[,] . . . the entire ROI involves privacy-sensitive material." *Id.* (Second Stein Decl. ¶ 91). This "sensitive, personal information," moreover, was "inextricably intertwined with DS's discussion and analysis of the information," and,

14

accordingly, "there was no additional, meaningful, non-exempt information that could be reasonably segregated and released." *Id.* at 33 (Second Stein Decl. ¶ 87). And, it is difficult to imagine how the State Department could disclose portions of the ROI without revealing its underlying law enforcement techniques and procedures—the fact that even a seemingly innocuous detail appears in the report conveys something about what the Department believes is significant or might lead to other relevant information.

For its part, Judicial Watch does not meaningfully contest the adequacy or accuracy of State's segregability analysis. Rather, in a conclusory fashion, it states that "[t]here are certainly facts that could be released without invading . . . Pagliano's privacy," and then requests that the Court conduct "*in camera* review of the [ROI]"[3] because State "has insufficiently provided enough detail." Dkt. 26 at 16–17. The Court declines the invitation. The D.C. Circuit has instructed that "a district court should conduct *in camera* review . . . in two situations": First, "if the affidavits . . . are conclusory" and second, "if there is evidence of agency bad faith." *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 392–93 (D.C. Cir. 1987). Although "*in camera* inspection" may be appropriate "when the requested documents 'are few in number and of short length,'" *id.* at 393 (quoting *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980)), courts "should not . . . resort[] to [it] as a matter of course, simply on the theory that 'it can't hurt,'" *Quiñon*, 86 F.3d at 1228 (quoting *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978)). Here, although the ROI is relatively short—sixteen pages—Stein attests that the Department engaged in a "line-by-line" review to ensure that there was no reasonably segregable information it could release, and Judicial Watch points to no evidence that State acted in bad faith. As such, there is no reason for

---

[3] Judicial Watch's cross-motion for summary judgment asks the Court for "*in camera* review of the time records . . . in this case." Dkt. 26 at 17. Because no "time records" are at issue, the Court assumes that Judicial Watch meant to seek *in camera* review of the ROI.

the Court to review the ROI *in camera*, and the Court concludes that the Department has adequately demonstrated that there was no reasonably segregable, non-exempt material in the ROI that it could release to Judicial Watch.

Accordingly, the Court will grant summary judgment to the State Department as to its withholding in full of Pagliano's ROI.

**B.     Email Chain**

Judicial Watch also challenges the State Department's invocation of Exemptions 5 and 6 to justify its partial redaction of the email chain between Secretary Clinton and General Petraeus. Dkt. 26 at 14–16.  It asserts that the email chain, which discussed potential personnel decisions, is "properly characterized" as "a few personal messages between friends" and "indicates no discussion about strategy, policy or government action" that would implicate Exemption 5's concern of countering the "chilling effect" that disclosing "policy deliberations" might have on "similar communications in the future." *Id.* at 15.  Judicial Watch also argues that the "identification of any third party discussed as [a] subject of a personal favor between high-ranking friends . . . does not constitute an unwarranted invasion of privacy" such that his or her name should be redacted under Exemption 6.  *Id.* at 16.  The Court addresses each exemption in turn.

1.     *Exemption 5*

Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The "deliberative process privilege is one of the litigation privileges incorporated into Exemption 5," allowing "an agency to withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'"  *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 4 (D.C. Cir.

2014) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)).  The privilege is

"limited to documents that are 'predecisional' and 'deliberative,' meaning they reflect advisory

opinions, recommendations, and deliberations comprising part of a process by which

governmental decisions and policies are formulated."  *Id.* at 7 (internal quotation marks and

alteration omitted); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir.

2006) ("[A] document [is] predecisional if 'it was generated before the adoption of an agency

policy' and deliberative if 'it reflects the give-and-take of the consultative process.'").  Where

records reflect such predecisional deliberations, the privilege "protects agencies from being

'forced to operate in a fishbowl.'"  *Elec. Frontier Found.*, 739 F.3d at 4 (internal quotation

marks omitted).

  The State Department explains that the "information withheld [in the email chain]

contains the author's opinions and recommendations as to potential personnel appointments [at

the State Department] and suggestions for an upcoming diplomatic engagement with a foreign

head of state."  Dkt. 22-1 at 18 (citing Dkt. 22-2 at 31 (Second Stein Decl. ¶ 82)).  It further

asserts that the withheld material is "predecisional" because the actions discussed had not yet

been taken, and it contends that release of the email chain in full would "have a chilling effect on

the open and frank exchange of ideas, recommendations, and opinions that occurs when U.S.

Government officials are developing a strategy for official action."  *Id.*  Judicial Watch responds

that the chain is merely "an inquiry between friends regarding a personal favor," and it disputes

that its disclosure would have a chilling effect on any future communications.  Dkt. 26 at 15.

  After a review of the redacted email exchange, Dkt. 26-1 at 6–7, and Stein's declaration,

Dkt. 22-2 at 31–32 (Second Stein Decl. ¶¶ 82–83), the Court concludes that the State Department

appropriately redacted the documents pursuant to Exemption 5.  First, the Court notes that,

although the email chain straddles the time before and after Secretary Clinton's appointment, the Department relies on Exemption 5 to protect only communications following her appointment. As a result, the Court is not confronted with the question whether the deliberative process privilege applies to those engaged in the transition between administrations or to nominees who are preparing to take on the duties of government. *Cf. Wolfe v. Dep't of Health & Human Servs.*, 711 F.2d 1077 (D.C. Cir. 1983) (evaluating whether records produced by transition team members are agency records subject to FOIA).

Second, the Court is unpersuaded that this email exchange "is properly characterized" as merely a "friendly correspondence" between "intimate friend[s]," Dkt. 26 at 15, that necessarily falls outside the reach of the deliberative process privilege. To the contrary, the exchange was between the Commander of the U.S. Central Command and the U.S. Secretary of State, and it involved "suggested actions to be taken toward a particular foreign head of state" and "potential personnel appointments in the Department" of State. Dkt. 22-2 at 31 (Second Stein Decl. ¶ 82). That description represents precisely the type of predecisional "agency[] group thinking" meant to "work[] out" State's policy as to two of its key responsibilities—staffing itself and interacting with foreign dignitaries. *Elec. Frontier Found.*, 739 F.3d at 4 (internal quotation marks omitted).

Third, the unredacted portions of the exchange provided by Judicial Watch corroborate Stein's description. General Petraeus, for example, "[s]trongly recommend[s]" that she take some action. Dkt. 26-1 at 6. The Court, accordingly, has no reason to doubt Stein's representation that these exchanges between senior government officials about foreign affairs and appointments fall well within the scope of the deliberative process privilege and are thus protected by Exemption 5.

The Court, therefore, concludes that State properly redacted the email exchange pursuant to Exemption 5's deliberative process privilege.

2. *Exemption 6*

"Exemption 6 protects information about individuals in 'personnel and medical files and similar files' when its disclosure 'would constitute a clearly unwarranted invasion of personal privacy.'" *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 257 (D.D.C. 2016) (quoting 5 U.S.C. § 552(b)(6)). The D.C. Circuit has explained that the exemption can sweep in "bits of personal information, such as names," *Judicial Watch*, 449 F.3d at 152, but the mere fact that an agency file or record contains personal, identifying information is not enough to invoke Exemption 6—the information must also be "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion," *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002). To make that determination, "the Court [must] employ[] a balancing test, weighing 'the private interest involved (namely the individual's right of privacy) against the public interest (namely, the basic purpose of [FOIA], which is to open agency action to the light of public scrutiny).'" *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 304 (D.D.C. 2007) (quoting *Judicial Watch*, 449 F.3d at 153). "In undertaking this analysis, the [C]ourt is guided by the instruction that, under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in [FOIA]." *Nat'l Ass'n of Home Builders*, 309 F.3d at 32 (internal quotation marks omitted).

Judicial Watch has disclaimed any objection to State's redaction of "personal email addresses and contact information" and challenges only its decision to redact the names of "any third party discussed" in the email chain as a potential personnel appointment. Dkt. 26 at 16; *see also* Dkt. 28 at 14. A number of additional redactions, moreover, were covered by both

Exemptions 5 and 6, and because the Court has already concluded that the Department has appropriately invoked Exemption 5, the Court need not consider whether Exemption 6 also applies to those redactions. This, then, leaves only two redactions. The first is contained in a January 14, 2009, email from General Petraeus to Secretary Clinton. In redacted form, that email says: "P.S. Any feedback on possibility of keeping [redacted] until his replacement is confirmed? As you recall this was a personal request from [redacted]. Best – Dave." Dkt. 26-1 at 7. And the second, again sent from General Petraeus to Secretary Clinton states: "Thx for making it happen [redacted]. Great news." *Id.*

To determine whether the State Department properly redacted the names from those emails under Exemption 6, the Court must balance the privacy interest of the individuals with respect to the public disclosure of their identities against the public interest in that disclosure. To do so, the Court "must first determine whether . . . disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If so, the Court must then "weigh that privacy interest in non-disclosure against the public interest in the release of records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy." *Id.*

There is little evidence or argument before the Court with respect to how to strike this balance. In its opening brief, the State Department merely asserts that "[r]elease of this information could subject these individuals to unwanted attention and harassing inquiries," Dkt. 22-1 at 19–20, and, in its reply brief, it simply adds that "Plaintiff provides no argument as to why the release of the names of personnel suggested for appointment under a different administration, more than eight years ago, would be of any public interest today," Dkt. 28 at 14. The analysis offered by Judicial Watch, for its part, is equally brief and conclusory. It merely

asserts that "identification of any third party discussed as [the] subject of a personal favor between high-ranking friends in the email exchange at issue does not constitute an unwarranted invasion of privacy for purposes of FOIA." Dkt. 26 at 16.

Based on this minimal record, the Court is unable to determine whether Exemption 6 covers the two redactions. It is certainly an overstatement, on the one hand, to claim that the identity of those considered for appointment to public office—even eight years ago—is invariably of no public interest. Yet, on the other hand, it is equally possible that the specific appointment discussed in the email exchange is, in fact, of no public interest. Nor can the Court assess the relevant privacy interests on the present record. Again, it is easy to imagine a set of facts that might implicate substantial privacy concerns, and it is equally easy to image a scenario under which a reasonable person would not care about a disclosure—and, indeed, might even welcome it.

The Court, accordingly, concludes that it cannot grant summary judgment in favor of either party on this issue on the present record. In order to expedite resolution of this one remaining issue, the Court will direct that the Department file a supplemental declaration addressing the specific privacy interests at stake and that it provide the Court with unredacted copies of General Petraeus's emails to Secretary Clinton dated January 10, 2009, and January 14, 2009, for *in camera* inspection. The Court will then permit the parties to renew their respective motions for summary judgment on this one issue. Because Judicial Watch does not object to the remaining redactions based solely on Exemption 6, which simply obscured General Petraeus's

email address, the Court will grant summary judgment in favor of the State Department on that issue.[4]

## CONCLUSION

For the reasons explained above, the Court **GRANTS** in part and **DENIES** in part State's motion for summary judgment, Dkt. 22, and **DENIES** Judicial Watch's cross-motion for summary judgment, Dkt. 26.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2017

---

[4] Earlier in this litigation, Judicial Watch objected to the adequacy of the Department's initial search for responsive documents.  See Dkt. 18 at 5 ("The Defendant has failed to meet its burden of proof regarding the sufficiency of its search.").  It now concedes that the supplemental declaration submitted by the Department suffices to meet its burden on this point and that Judicial Watch "is not challenging the adequacy of Defendant's initial search for responsive records."  Dkt. 26 at 7 n.1.  Nor has it challenged the adequacy of the supplemental searches. The Court, moreover, having reviewed the Department's thorough declarations setting out the procedures used to effect the searches, Dkt. 17-2 (First. Stein Decl.); Dkt. 22-2 (Second Stein Decl.), concurs with the assessment that the searches were adequate.  "An agency fulfills its obligations . . . if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). The State Department has done that.  Its declarations lay out the search process with sufficient detail for the Court to conclude that they were "reasonably calculated to uncover all relevant documents," *id.* at 325, and they explain which search terms were used, which record systems were queried, and why the combination of systems and terms would produce all the relevant documents.  *See* Dkt. 17-2 at 5–24 (First Stein Decl. ¶¶ 18–61); Dkt. 22-2 at 6–25 (Second Stein Decl. ¶¶ 20–65).  The Court, accordingly, concludes that each search was "reasonably calculated to uncover all relevant documents."  *Truitt*, 897 F.3d at 542.